Residential Funding Company, LLC and            Civ. No. 13-3519 (PAM/HB)
ResCap Liquidating Trust,

           Plaintiffs,

v.                                     **MEMORANDUM AND ORDER**

Universal American Mortgage Company,
LLC,

           Defendant.

_____

This matter is before the Court on the parties' Motions for Summary Judgment and Motions to Exclude Expert Witnesses. For the following reasons, the Motions are granted in part and denied in part.

## BACKGROUND

Plaintiffs Residential Funding Company and ResCap Liquidating Trust (collectively, "RFC") claim that Defendant Universal American Mortgage Company breached the parties' contracts and must indemnify RFC for allegedly defective mortgage loans that Universal sold to RFC and RFC subsequently aggregated into mortgage-backed securities trusts ("RMBS trusts"). When the housing market collapsed in 2008, the RMBS trusts suffered huge losses. The trusts sued RFC, forcing RFC into bankruptcy. In 2013, RFC paid more than $8.5 billion to settle the trusts' and their insurers' claims in the bankruptcy case. In this lawsuit, RFC seeks to recoup some of those losses from Universal.

Universal sold mortgage loans to RFC for more than 20 years. At issue here, however, are 1186 loans[1] that Universal sold to RFC, most of which originated between 2003 and 2007. (Pls.' Confidential Updated Loan List, Thomson Aff. Ex. 41 (Docket No. 911).) The parties refer to these loans as the "At-Issue" loans, and according to Universal they constitute less than 0.06% of the approximately 2 million loans involved in the bankruptcy settlement.

This case is one of more than 30 that RFC filed in this District seeking recompense from lenders for the bankruptcy settlement. Most of these cases were consolidated before Judge Susan Richard Nelson; several were assigned to the undersigned. Many have since settled, with the exception of this case and six cases still pending before Judge Nelson.

Judge Nelson recently ruled on substantially similar Motions in her still-pending cases. In re RFC and ResCap Liquidating Trust Litig., Civ. No. 13-3451 (D. Minn. filed Dec. 12, 2013). For ease of reference, the Court will refer to Judge Nelson's rulings as "In re RFC SJ Order" (Docket No. 4307) and "In re RFC Daubert Order" (Docket No. 4471). Although the Court has conducted an independent review of the parties' arguments and the legal standards at issue, Judge Nelson's rulings are thorough and illuminating. As discussed further below, the Court agrees with most of Judge Nelson's decisions, and her reasoning is incorporated by reference.

---

[1] The parties initially claimed that there are 1104 loans at issue. Later in their briefing, this number becomes 1122 loans. But by the Court's count, there are 1186 loans on the list at Docket No. 911.

**DISCUSSION**

**A.      Universal's Summary-Judgment Motion**

**1.      Standing**

Universal contends that Plaintiff Residential Funding Company LLC lacks standing because it transferred its rights under all of its contracts to co-Plaintiff ResCap Liquidating Trust.   Plaintiffs do not seriously oppose the dismissal of RFC from the action but ask that any dismissal be based on Universal's "acknowledgment" that ResCap succeeded to RFC's rights.

Because there is no dispute that Residential Funding Company has no interest in this litigation, it will be dismissed.   The Court will continue to refer to Plaintiff as RFC.

**2.      Sampling**

Out of the approximately 1100 Universal loans at issue here, RFC conducted a re-underwriting analysis on a random sample of 153 loans.   RFC contends that its sampling analysis revealed defects in a significant proportion of the at-issue loans.

Universal argues that RFC should not be allowed to use statistical sampling to determine either breaches or damages.[2]   Instead, according to Universal, RFC must prove that each loan was defective and what damages flowed from that particular loan's defects, because the parties' agreement[3] phrases its duties with regard to "each loan."   (See, e.g.,

_____

[2] RFC has cross-moved for summary judgment, seeking a ruling that it may prove its claims using statistical sampling.

[3] The parties' agreement is a document called the Client Guide.   (Duvall Decl. Ex. 39

Client Guide § A202.)

Judge Nelson thoroughly addressed this argument and rejected it, determining that the "each loan" language from the Client Guide does not mean that RFC must prove its claims "loan by loan." In re RFC SJ Order at 68. Indeed, as Judge Nelson noted, sampling may be the only way to manage proof of liability and damages with such large loan populations. Id. at 69-70. While Universal contends that sampling is inappropriate, each party's analysis of the small 153-loan sample was expensive and time-consuming. Conducting that sort of analysis on the entire population of loans would be unmanageable and is unnecessary. This Court agrees with Judge Nelson: sampling is appropriate. Universal's Motion on this point is denied and RFC's Motion is granted.

**3. Causation**

The Client Guide provides that lenders must indemnify RFC from "all losses" "resulting from" or "arising from" a breach of the lenders' representations and warranties. (Client Guide § A212.) Both parties seek summary judgment on the proper interpretation of the Client Guide's causation standard.

---

(Docket No. 856) (Nov. 21, 2005, Client Guide).) This guide "governed the business relationship between RFC and [Universal]." In re RFC SJ Order at 8. Universal disputes whether the Client Guide applies to all or some of the loans at issue, but as Judge Nelson did, the Court will assume that it applies. The parties seem to agree that the final determination as to the Client Guide's applicability is a question of fact for the jury to determine. See id. at 8 n.5.

Universal contends that summary judgment is appropriate because the contract requires but-for causation. Universal contends that because its allegedly bad loans were only a tiny fraction of the total loans involved in the bankruptcy settlement, Universal could not have been a but-for cause of RFC's decision to settle in the bankruptcy case. RFC counters that Universal's theory amounts to a proximate cause standard, when the correct standard is contributing cause. RFC asks the Court to find as a matter of law that it has established that Universal's breaches were a contributing cause of RFC's liability in the bankruptcy settlements.

The Court agrees with Judge Nelson's resolution of the causation issue. As Judge Nelson noted, the correct causation standard is drawn from the parties' contract, not from the common law. In re RFC SJ Order at 93. The Client Guide's "resulting from" or "arising out of" causation standard "mean[s] causally connected with, not 'proximately caused by.'" Id. at 94 (quoting Faber v. Roelofs, 250 N.W.2d 817, 822 (Minn. 1977)). "This does not require that Plaintiffs show that any individual Defendant's breaches were the sole cause of Plaintiffs' liabilities and losses—it merely requires that Plaintiffs show that an individual Defendant's breaches were a contributing cause of those liabilities and losses." Id. at 95 (emphases omitted).

But there are genuine issues of fact regarding causation here. Specifically, the parties offer conflicting expert witness opinions regarding whether the claims the trusts and insurers asserted against RFC were based on the lenders' alleged breaches of the Client

5

Guide, or on RFC's own representations to the trusts and insurers.   See id. at 100. Resolution of these disputed opinions is inappropriate on summary judgment.

### 4.    Statute of Limitations

Universal contends that RFC's breach-of-contract claims are untimely for loans sold before May 14, 2006.   Universal asserts that 644 of its at-issue loans were sold before that date.   Earlier in this litigation, RFC successfully defended motions to dismiss on the statue-of-limitations issue by arguing that Section A201(M) of the Client Guide imposes a continuing obligation on the lenders to inform RFC of problems with the underlying loans. But as Judge Nelson noted, in the intervening two to four years since the motions to dismiss, RFC has come up with no evidence "that after May 14, 2006, a [lender] failed to notify RFC of information that might trigger the Section A201(M) obligation as to a loan sold before May 14, 2006."   In re RFC SJ Order at 145.   Thus, she determined that the statute of limitations bars RFC's contract claims for loans sold before May 14, 2006.   Id.

RFC argues that its "analysis indicates that [Universal's] number [of untimely loans] is inflated by more than 40%."   (Pls.' Opp'n Mem. (Docket No. 859) at 21.)   But RFC does not provide the Court with its own calculation as to how many of Universal's at-issue loans were funded before May 14, 2006.   And Universal points out that RFC's own "loan list shows that 449 out of 1122 at-issue loans were funded before May 14, 2006."   (Def.'s Reply Mem. (Docket No. 909) at 6 n.5; see also Ex. 41 (Docket No. 911).) [4]

---

[4] Universal acknowledges one of the pre-2006 loans is not subject to dismissal, because

Although the precise number remains to be determined, it is clear that the statute of limitations bars RFC's breach-of-contract claims as to any loan that funded before May 14, 2006. Universal's Motion on this point is granted, and RFC's contract claims as to those loans are dismissed with prejudice.

However, Universal's argument that RFC's indemnity claims are subject to the same statute of limitations is without merit. RFC's indemnity claims are not breach-of-contract claims "repackaged" as indemnification claims. And courts, including this Court, have repeatedly rejected this argument, finding that RFC's indemnity claims did not accrue until RFC's liability was fixed, which was not until RFC settled the claims against it. <u>See</u> <u>In re RFC</u> SJ Order at 146 (citing cases). RFC's indemnification claims are not untimely.

**5.      Damages**

RFC's damages expert witness, Dr. Karl Snow, uses three different methods to calculate RFC's damages: the Breaching Loss approach, the Allocated Loss approach, and the Allocated Breaching Loss approach. <u>In re RFC</u> SJ order at 150. Universal contends that each of these approaches is fundamentally flawed and should be excluded as speculative.

---

there is evidence that Universal knew of information regarding this loan that it should have communicated to RFC under Section A201(M).

a.    Breaching Loss approach

The Breaching Loss approach calculates the amount of loss RFC suffered from each bank's breaching loans.  So, for example, if a breaching loan went into default with a balance of $150,000 including interest and fees, RFC's loss under this approach would be $150,000 minus whatever proceeds were realized from the sale of the property.  This approach is based on the repurchase remedy from the Client Guide, which requires a lender to repurchase defective loans within 30 days of RFC's demand that it do so.   (Client Guide § A210(A).)   Universal argues that the Breaching Loss approach's reliance on this remedy is inappropriate because RFC no longer owned any of the loans at issue—they were all sold into the RMBS trusts.  Thus, there was nothing to repurchase.  Moreover, any loss was incurred by the trusts and their insurers, not RFC, making this damages model inapplicable in any event.

The flaw with the Breaching Loss approach, however, is more simple:  it does not account for any discount RFC negotiated in the bankruptcy settlements.  Dr. Snow determined that RFC settled its claims for less than 30 cents on the dollar.  (Snow Rpt. ¶ 91.)   But the Breaching Loss approach measures "each [lender's] share of the indemnification liability as equal to 100% of the losses on the [lender's] allegedly breaching loans, despite the steep discount agreed to in the Settlements."  In re RFC SJ Order at 159.   This windfall alone makes the Breach Loss approach excludable. Universal's Motion as to this approach is granted.

b.  Allocated Loss approach

The Allocated Loss approach assesses damages based on each bank's share of total losses on all loans, not just breaching loans.  The total losses are capped at the amount RFC agreed to pay in the bankruptcy settlements.  Thus, unlike the Breaching Loss approach, this approach provides no windfall to RFC.

Universal challenges this approach because it is not based on Universal's alleged breaches of the Client Guide, but rather is based only on Universal's share of the total population of at-issue loans.  The Court agrees.  The Client Guide does not permit RFC to seek indemnity for any loss a loan experiences, but only for losses caused by Universal's failure to abide by the Client Guide.  Thus, for example, a loan that falls into default because the homeowner became ill would sustain a loss, but unless Universal's representations regarding the loan were faulty would not constitute a breaching loan for which indemnification was required.  Universal's Motion as to this approach is granted.

c.  Allocated Breaching Loss approach

The Allocated Breaching Loss approach allocates a portion of the settlement based on a ratio of Universal's breaching losses on its at-issue loans to the overall breaching losses on all at-issue loans.  This approach does not hold Universal responsible for all losses RFC suffered, but only for its portion of RFC's settlement obligations.

Universal attacks the Allocated Breaching Loss approach as too speculative to allow a jury to correctly calculate damages.  But this method is sufficiently specific to "provide[]

the factfinder with a non-speculative basis to assess the value of the claims that are identifiable by Defendants." In re RFC SJ order at 175.   As Judge Nelson found,

> The model assigns damages to a [lender] based on the number of loans it sold to RFC, which is a concrete and verifiable number.   The model also assesses economic losses to at-issue mortgages based on reliable loan data.   Further, the model targets its assessment of damages toward only those loans that it estimates contained breaches of the Client Guide and Trust Agreement based on a sampling protocol.

Id. at 175-76.   This approach complies with Minnesota's requirement that a plaintiff prove damages to a reasonable certainty that need not be mathematically precise.   Poppler v. Wright Hennepin Co-Op Elec. Ass'n, 834 N.W.2d 527, 546 (Minn. Ct. App. 2013).   The Allocated Breaching Loss approach is an appropriate method for calculating damages, and Universal's Motion to exclude this approach is denied.

### 6.  Experts

Finally, Universal contends that RFC's expert opinions are flawed and should be excluded, and that, if excluded, RFC's claims fail.   As discussed below, however, the Court declines to exclude most of the challenged expert testimony.   Universal's Motion on this point is denied.

### 7.  Conclusion

Universal is entitled to summary judgment on RFC's lack of standing, the statute of limitations, and that RFC may not present to the jury either the Breaching Loss approach or the Allocated Loss approach.   The remainder of Universal's Motion, however, is denied.

**B.     RFC's Summary-Judgment Motion**

RFC's Motion for Partial Summary Judgment raises many of the same issues discussed above.   The Court will discuss below only the unique issues RFC raises.

**1.     "Sole discretion"**

a.     Breaches

RFC contends that summary judgment is appropriate, finding that the Client Guide confers sole discretion on RFC to determine breaches and settle claims.   The terms of the Client Guide are undeniably broad:   "Whenever any provision of this Client Guide contract requires []RFC to make a determination of fact or a decision to act, or to permit, approve or deny another party's action such determination or decision shall be made in []RFC's sole discretion."   (Client Guide § 113B.)   And the Client Guide allows RFC to make several relevant determinations, including whether events of default have occurred. (Id. § A210(A).)   Universal's obligations to indemnify RFC, as well as RFC's breach-of-contract claim against Universal, arise out of alleged events of default with respect to Universal's at-issue loans.

Universal contends that this "sole discretion" language pertains only to RFC's exercise of the repurchase remedy.   Universal's contention is belied by the broad wording of section 113B, however.   The section does not contain any limiting language, and like Judge Nelson, this Court rejects Universal's "strained reading" of the Client Guide.   In re RFC SJ Order at 72.   Moreover, the Eighth Circuit has already affirmed this understanding

of RFC's discretion, finding that "[t]he Client Guide gives [RFC] 'sole discretion' to determine whether an Event of Default has occurred . . . .  There is nothing ambiguous about this language."  Residential Funding Co. v. Terrace Mortgage Co., 725 F.3d 910, 916 (8th Cir. 2013).  RFC's Motion on this point is granted.

      b.    Settlement decisions

A party seeking indemnity from another for a settlement must, under Minnesota law, establish not only that the underlying claims fall within the parties' indemnification agreement, but also that the settlement was reasonable.  Osgood v. Med., Inc., 415 N.W.2d 896, 903 (Minn. Ct. App. 1987).  RFC asks the Court to determine that the Client Guide gives RFC the sole discretion to enter into settlements, and thus that Universal may not challenge the underlying settlements as unreasonable under Minnesota law.

The Client Guide allows RFC to make settlement decisions without consulting Universal.  (See Client Guide § A212 (providing that RFC "has the right to control any litigation . . related to a Loan, including but not limited to . . . making settlement decisions").)  But as Judge Nelson found, the Client Guide cannot override Minnesota's reasonableness requirement.  In re RFC SJ Order at 77.  Judge Nelson ultimately declined to find as a matter of law that the settlements were reasonable, instead determining that there are questions of fact as to the reasonableness of the settlements and that this issue is for the jury to determine.  (Docket No. 4458.)

The Court respectfully disagrees with Judge Nelson's conclusion regarding proving reasonableness. While reasonableness may in some instances be a question of fact, when the facts are such that a reasonable factfinder would only make one determination, the Court may make that determination as a matter of law. See, e.g., Young v. Pollock Eng'g Grp., Inc., 428 F.3d 786, 794 (8th Cir. 2005) (stating that when there is "no room for an honest difference of opinion among reasonable people" the court may determine a question of fact) (quotation omitted); Swarthout v. Mut. Serv. Life Ins. Co., 632 N.W.2d 741, 745 (Minn. Ct. App. 2001) (holding that questions of fact can become questions of law "if reasonable persons can draw only one conclusion from the evidence"). This settlement was negotiated over a period of many months, and an experienced federal bankruptcy judge actively presided over those negotiations. See In re RFC SJ Order at 12-20 (describing bankruptcy and settlement process). The settlements were approved in painstaking fashion by another experienced federal bankruptcy judge. See id. at 16 (noting bankruptcy judge's 134-page opinion regarding the bankruptcy plan and settlements). And the bankruptcy judge specifically found that the settlements were reasonable. Id. at 17.

This Court agrees with the conclusions of the bankruptcy judge. The bankruptcy settlements were reasonable as a matter of law and the parties will not be permitted to present evidence to the jury on this issue.

## 2. Recovery

The parties dispute whether the Client Guide allows RFC to recover only its actual losses or its liabilities. Actual losses are what RFC paid in the settlements, while liabilities include all claims that were allowed in the bankruptcy matter without the reduction factor that the settlement reflected. This difference is significant, because as noted previously, RFC settled the claims against it for less than 30 cents on the dollar.

Universal implicitly acknowledges that the Client Guide that took effect in December 2005 requires Universal to indemnify RFC for all liabilities, not just losses. (See Def.'s Opp'n Mem. (Docket No. 852) at 14 (stating that the "pre-December 2005 Guide does not authorize [RFC] to seek indemnity for liabilities").) The newer version of the Client Guide provides for indemnification from all "judgments," "liabilities," and "claim[s]" against or involving RFC. (Client Guide § A212.) Thus, Universal must indemnify RFC for any liabilities RFC incurred after December 2005.

The pre-December 2005 Client Guide, however, did not use the term "liabilities." (See Ex. 38 (Docket No. 855) (Dec. 1, 1999, Client Guide).) Rather, the precursor to section A212 provided that lenders "shall indemnify []RFC from all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses resulting from any Event of Default . . .; or from any claim, demand, defense, or assertion against or involving []RFC . . . ." (Id. § 274.) Universal argues that this provision's failure to include "liabilities" means that RFC is entitled to seek

only its actual losses on loans subject to this version of the Client Guide.

The text of section A212 does not support Universal's narrow reading of the earlier Client Guide. The term "judgments" alone includes liabilities, and the section's separation of losses and claims indicates that "claims" are not a subset of "losses," as Universal argues. As Judge Nelson held, the addition of "liabilities" in the newer Client Guide "only served to clarify the language rather than materially alter the terms of the contract." In re RFC SJ Order at 87 (emphasis omitted). Universal is obligated to indemnify RFC for its liabilities, not merely its actual losses.

RFC takes its arguments a step further, asking that the Court determine as a matter of law that it can recover from Universal all losses RFC incurred on Universal's breaching loans, without requiring any allocation to account for the settlements. But as the Court previously discussed, the Breaching Loss approach, which does not make any allocation for the settlements, is an inappropriate way to measure the damages here. RFC's Motion on this point is denied.

### 3. Causation

RFC asks the Court to hold as a matter of law that Universal's breaches of the Client Guide caused RFC's losses and liabilities. According to RFC, the evidence is undisputed that the claims of the RMBS trusts and insurers arose out of defects in the loans that Universal and other lenders sold to RFC. Because RFC made representations to the trusts and insurers based on Universal's representations to RFC, RFC contends that there can be

no question that Universal's breaches of the Client Guide caused the creditors' claims.

As discussed above, the Client Guide requires only that RFC establish that Universal's breaches were a contributing cause of RFC's losses and liabilities. But while RFC has proffered evidence that could establish Universal's responsibility for RFC's losses in the bankruptcy settlement, Universal has proffered contrary evidence. In particular, the expert witnesses vehemently disagree about this issue, with Universal's experts opining that RFC's pool-wide representations to the RMBS trusts cannot be tied to any Client-Guide required loan-level representation that Universal made to RFC. Such disputed questions of fact are not appropriate for resolution on a motion for summary judgment, and RFC's Motion on this point is denied. See In re RFC SJ Order at 103 (noting that "the parties present a classic battle of the experts that cannot be resolved on summary judgment").

### 4. Affirmative Defenses

RFC next seeks summary judgment on three of Universal's affirmative defenses: reliance, good faith and fair dealing, and waiver and estoppel.

#### a. Reliance

Universal's 12th affirmative defense asserts that RFC did not rely on Universal's representations and warranties and would have purchased the loans even if it had known about the alleged defects in the loans.

The Client Guide provides that each lender "acknowledges that []RFC purchases Loans in reliance upon the accuracy and truth of the [lender's] representations and warranties" and in reliance on the lender's "compliance with the agreements, requirements, terms and conditions set forth" in the Client Guide and related agreements. (Client Guide § A200.) Universal cannot escape the import of this provision, which constitutes Universal's express acknowledgement that RFC bought the loans in reliance on the lender's representations and warranties, that the lenders would be liable for any misrepresentation or breach of warranty regardless of RFC's knowledge of the misrepresentation or breach of the lenders' representations and warranties, and that RFC had no obligation to investigate or review the lenders' representations and warranties. In re RFC SJ Order at 130. "The plain language of these provisions is clear: under the parties' bargain, whether RFC actually relied on the [representations and warranties] . . . is wholly irrelevant." Id. The lenders argued that they did not agree that RFC would rely on the accuracy of their representations when making its own representations to the RMBS trusts. But as Judge Nelson stated, this argument is a causation argument repackaged as a reliance argument. Id. at 131.

Under the Client Guide, reliance is presumed and may not be disputed. RFC's Motion on this point is granted.

### b. Good faith and fair dealing

Universal's 11th affirmative defense contends that the covenant of good faith and fair dealing bars RFC's claims here. According to Universal, by declaring mass events of default, RFC abused the discretion the Client Guide gave it. Universal argues that the Client Guide required RFC to declare defaults on a loan-by-loan basis.

While Minnesota law implies a covenant of good faith and fair dealing in every contract, that covenant cannot supplant other contract provisions. Moreover, to establish a breach of this covenant, a party must establish that its opponent "acted 'dishonestly, maliciously, or otherwise in subjective bad faith.'" In re RFC SJ Order at 136 (quoting BP Prods. N. Am. Inc. v. Twin Cities Stores, Inc., 534 F. Supp. 2d 959, 968 (D. Minn. 2007) (Schiltz, J.)). Universal has no such evidence here. Rather, RFC did what the contract permits: it exercised its discretion to determine events of default with respect to the securitized loans. RFC's Motion on this affirmative defense is granted. See In re RFC SJ Order at 138.

### c. Waiver and estoppel

Universal's 15th affirmative defense contends that RFC's claims are barred by waiver and estoppel, because it ostensibly knew of the breaches and bought or securitized the loans despite that knowledge. The terms of the Client Guide, however, provide that Universal can be "fully liable for any misrepresentation or breach of warranty regardless of whether it or []RFC actually had, or reasonably could have been expected to obtain,

knowledge of the facts giving rise to such misrepresentation or breach of warranty."
(Client Guide § A200.)   This provision further explains that Universal's representations
and warranties "are not affected by any investigation or review made by, or on behalf of,
[]RFC except when expressly waived in writing by []RFC."   (Id.)

Universal contends that Minnesota law requires the Court to submit the issue of
waiver and estoppel to the jury.   Relying principally on <u>Pollard v. Southdale Gardens of
Edina Condominium Association, Inc.</u>, 698 N.W.2d 449 (Minn. Ct. App. 2005), Universal
argues that "the mere presence of a nonwaiver clause does not automatically bar a waiver
claim."   (Def.'s Opp'n Mem. (Docket No. 852) at 50 (quoting <u>Pollard</u>, 698 N.W.2d at
453).)   Moreover, Universal asserts that the Client Guide's nonwaiver clause cannot in
any event preclude an estoppel claim.   (<u>Id.</u> at 51 (citing <u>Pollard</u>, 698 N.W.2d at 454).)

The holding in <u>Pollard</u> is inapposite.   The nonwaiver clause in <u>Pollard</u> did not
contain a writing requirement, as the Client Guide does.   <u>See</u> <u>Pollard</u>, 698 N.W.2d at 451-
52.   The nonwaiver clause at issue here is susceptible to only one interpretation, and that
is to preclude any defense of waiver and estoppel with regard to RFC's knowledge or
conduct unless RFC agreed to waive the issue in writing.   There is no evidence of any
writing here, and summary judgment is appropriate on Universal's 15th affirmative
defense.

### 5. Other arguments

Universal continues to press the oft-rejected argument that RFC has no liability for which Universal can provide indemnity because all of RFC's liabilities were extinguished in the bankruptcy proceeding. This argument is utterly without merit. While a bankruptcy termination often does extinguish a debtor's liability, that termination is subject to the terms of the confirmed plan. Here, the plan specifically provided that RFC's liabilities, as well as its claims against the lenders, were not extinguished at the plan's confirmation. The plan established the liquidating trust and provided that all causes of action RFC had were preserved in the trust. And the plan "unequivocally preserves Rescap's right to indemnification for the claims at issue here." In re RFC SJ Order at 53. The Court rejects Universal's attempt to circumvent the clear language of the confirmation plan.

Nor can Universal contend that RFC's indemnity claim is precluded by RFC's own fraud or negligence. The Client Guide requires the lenders to indemnify RFC against any claim, even one regarding RFC's own conduct: "Sections A202(II) and A212 clearly and unequivocally express the parties' intent to transfer liability to [the lenders] for RFC's own acts of negligence." In re RFC SJ Order at 36. And because there is no evidence that RFC has ever been found liable for intentional misconduct or fraud, there is no support for Universal's attempt to evade liability for indemnification based on Universal's bare allegation of intentional misconduct. See In re RFC SJ Order at 41-42.

**6.     Conclusion**

RFC has established that it is entitled to summary judgment on its discretion to determine breaches of the Client Guide, on its experts' use of sampling to prove RFC's claims, that the Client Guide imposes a contributing cause standard for liability, that the bankruptcy settlements were reasonable, that it may recover its losses and liabilities, and on Universal's 11th, 12th, and 15th affirmative defenses.   The remainder of RFC's Motion is denied.

**D.     Universal's Daubert Motions**

The Supreme Court has assigned district courts with the role of gatekeeper to ensure that only relevant and reliable expert testimony is admitted under Fed. R. Evid. 702. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993).   To determine reliability, the Court should examine (1) whether the theory or technique "can be (and has been) tested," (2) whether it "has been subjected to peer review and publication," (3) the "known or potential rate of error," and (4) whether the theory or technique has been generally accepted within the relevant scientific community.   Id. at 592-94.

 "[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."   Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001) (quotation omitted).   The Court should exclude an expert witness "[o]nly if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury."

Id. at 929-30. However, the Court should not admit expert opinion evidence that "is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

### 1. Dr. Karl Snow

Dr. Snow is RFC's principal damages expert. The Court has already ruled on the merits of some of Universal's objections to Dr. Snow's proposed testimony, finding that Dr. Snow's sampling methodology is sufficiently reliable, and finding that one of the three loss approaches he advocates may be presented to the jury. Universal's Motion on sampling and the Allocated Breaching Loss approach is denied, but is granted with respect to the two loss approaches the Court previously excluded.

Universal also argues that Dr. Snow's calculations are fatally flawed because he relied on the analysis of Steven Butler,[5] who conducted a reunderwriting as to a sample of loans. According to Universal, Butler's reunderwriting analysis is fundamentally unreliable because it focused on whether anything was amiss at the time of the loan's origination, rather than at the time RFC received notice of the alleged breach with regard to the loan. Universal maintains that a breach at the loan's origination, such as the borrower's failure to produce a required document at closing, might not be material later in the life of the loan, and only material breaches could trigger the cure-and-repurchase

---

[5] Despite Universal's contention in its summary-judgment briefing that "Butler's opinion on this topic is inadmissible legal opinion" (Def.'s Supp. Mem. (Docket No. 747) at 16), Universal did not move to exclude any of Mr. Butler's opinions.

remedy in the agreements that pooled RFC's loans into the RMBS trusts.

The question the jury must answer is whether Universal breached a duty to RFC that caused RFC to breach its agreements with the RMBS trusts. Thus, a breach at the time of origination is relevant in the first instance, because such a breach likely triggered Universal's duties to RFC. Universal can argue to the jury that its alleged breaches did not have a materially adverse effect on the loans and could not have caused RFC's breaches of its duties to the RMBS trusts. This is not a reason to exclude Dr. Snow's opinions.

Universal also contends that, even if sampling is allowed, Dr. Snow's sampling is untrustworthy because he allegedly used the wrong loan population from which to draw his sample. Dr. Snow used a population of approximately 460,000 at-issue loans, which are loans that as of a certain date had actual losses of at least $500 or were 90 or more days delinquent, in foreclosure, or real-estate owned. From this population, he estimated breach rates for Universal's loans. But more than 2 million loans were involved in the bankruptcy settlements and according to Universal, Dr. Snow could not have correctly calculated a breach rate by sampling only the subset of breaching loans. Moreover, Universal maintains that he cannot reliably estimate the percentage of the settlements that can be attributed to Universal's share of the at-issue loans as opposed to the other 1.5 million loans.

RFC points out that the remaining 1.5 million loans caused less than $900 million in losses to the trusts, while the 463,000 at-issue loans caused $42 billion in losses. Indeed,

nearly 1.3 million loans caused no loss whatsoever, because they were not in foreclosure or otherwise delinquent. Thus, Dr. Snow's failure to include those loans in his sampling protocol was correct. Regardless, the inclusion of the total loan population would not materially change Dr. Snow's conclusions regarding the losses for which Universal is responsible. Universal's Motion on this point is denied.

Finally, Universal argues that Dr. Snow's opinions on the breach rates in the insurer settlements is flawed because he allegedly allocates each settlement to specific loan pools according to the breach rate of those pools. Universal contends that Snow did not conduct any pool-specific sampling, so he impermissibly extrapolates breach rates from samples drawn from all the pools and insurers to specific pools and specific insurers. Any issues with Snow's methods, however, are a matter for cross-examination, and do not render his opinions excludable.

Universal's Motion to Exclude Dr. Snow is denied, except as to the two loss approaches previously excluded.

### 2. Judge Richard Solum

Judge Solum opines on the reasonableness of the three loss approaches that Dr. Snow proposes, based on his "experience in assessing, resolving and/or mediating the settlement of potential liabilities in respect to multi-defendant cases." (Solum Rpt. (Def.'s Ex. 23) ¶ 24.) Having determined that only the Allocated Breaching Loss approach can be presented to the jury, expert testimony regarding the reasonableness of Dr. Snow's

methodology is unnecessary. Moreover, it is not appropriate to bolster the credibility of one expert witness with the testimony of another. See Westcott v. Crinklaw, 68 F.3d 1073, 1076 (8th Cir. 1995) (discussing impropriety of using expert testimony to bolster a different witness's credibility). Whether Dr. Snow's Allocated Breaching Loss approach is an appropriate way to allocate the losses here is something for the jury to determine. Universal's Motion to exclude Judge Solum is granted.

### 3. Steven Albert, Dr. John Kilpatrick, Dr. Albert Lee

These three witnesses will offer opinions regarding alleged appraisal value inflation in Universal's loans. Appraisal value is an important concept in this litigation. The Client Guide prohibited lenders from selling loans to RFC that exceeded certain prescribed loan-to-value ratios, which are determined in part by reference to a property's appraisal values.

Universal first contends that the computer program RFC uses to bolster its claims of appraisal inflation is unreliable and should be excluded. According to Universal, the computer program, called Greenfield AVM or GAVM, estimates property values by using data from after the date of the bankruptcy settlements. Specifically, the GAVM uses as one input the tax-assessed value of the property which is drawn from tax assessments in 2013 and later, when most of the loans at issue closed in 2007 or before.

Universal also argues that the three experts should be excluded for various reasons. Dr. Kilpatrick created the GAVM model and Dr. Lee collaborated with him on applying

the model to the loans in this case. If the GAVM showed that the loan's original appraised value was more than 15% higher than the GAVM estimated value, then the third expert, Steven Albert, reviewed the original appraisal and offered an opinion as to whether that appraisal violated the Uniform Standards of Professional Appraisal Practice and were therefore not credible. A fourth expert, Steven Butler, then used Albert's opinion to find breaches of the Client Guide for certain loans whose GAVM estimated value was more than 15% lower than the original appraised value and whose recalculated loan-to-value ratio was either more than 100% or exceeded the guidelines by more than 10%.

Universal contends that all of these experts should be excluded because they rely on a computer program that did not exist at the time of the settlements in question. But when the program was created has no bearing on whether it can reliably offer information regarding the facts of the case.

Universal's contention that the program relies on new data is not well taken. As RFC explains, while the program sometimes uses tax assessed value from 2013 or after, this newer tax-assessed value is used only to determine whether there are anomalies in the correlation between the subject properties' original value and tax-assessed value and the appraised value and tax-assessed value of other comparable neighboring properties. As Dr. Lee testified, the tax-assessed value "improves the explanatory power of the" GAVM program. (Lee Decl. ¶ 9.) Moreover, comprehensive tax-assessed value data from earlier periods is simply not available.

Universal also asks the Court to exclude the opinions of Albert and Kilpatrick as to appraisal misconduct in the market in general in the early 2000s. Universal argues that this testimony is not tied to any Universal loan in particular and will inflame or confuse the jury. RFC points out that the testimony is not that a few appraisers felt pressured by loan originators to inflate appraisals, but that nearly 90% of appraisers felt that way. RFC also notes that appraisers on Universal's loans were some of the more than 11,000 appraisers who signed a petition to the government asking for relief from the pressure to inflate appraisals.

The subject of this litigation is not the housing crisis nor is it the factors that led to that crisis. A jury is entitled, however, to background information that helps them to understand the history giving rise to the current dispute. The Court will not exclude the challenged testimony, but Universal may object if it believes that any specific testimony is irrelevant, unfairly prejudicial, or otherwise in violation of the Rules of Evidence.

Universal's Motion to exclude these experts is thus denied without prejudice to specific objection at trial.

### 4. Donald Hawthorne

Mr. Hawthorne is a litigator who offers his opinion that the bankruptcy settlements were reasonable. The Court has already determined that the settlements were reasonable, and thus Mr. Hawthorne's testimony is unnecessary. Universal's Motion as to Mr. Hawthorne is granted.

### 5. Conclusion

Universal's Motion to Exclude is granted as to Judge Solum and Donald Hawthorne, and as to Dr. Snow's two previously excluded loss approaches. It is denied in all other respects.

### E. RFC's Daubert Motion

### 1. William Berliner

Mr. Berliner is offered as a rebuttal expert for RFC's expert Henry Hayssen, who is an expert on the RMBS market and offers background testimony on the securitization of mortgages. According to RFC, however, the testimony Berliner offers is not rebuttal; indeed, Berliner's report concedes that much of his testimony is not offered in rebuttal to RFC's expert, but rather is affirmative testimony regarding "context to the history and rationales behind the development of the RMBS market and its various sub-markets." (Rand Decl. Ex. 2 (Docket No. 792) (Berliner Report) at 13.) While the Court does not countenance gamesmanship with regard to expert witnesses, the Court will not exclude Berliner's testimony merely because some of that testimony is not rebuttal opinion.

One of the subjects of Berliner's testimony is whether RFC relied on Universal's representations. Reliance is not an element of a breach-of-contact claim, and thus any testimony regarding reliance is irrelevant. RFC also argues that Berliner will offer impermissible testimony regarding causation. While causation is a disputed issue, the Court will not permit Universal to present the jury with testimony that the causation

standard is proximate cause rather than contributing cause.  To the extent that Berliner's testimony comports with a contributing cause standard, it is admissible.

RFC's Motion to exclude Berliner's testimony is granted in part and denied in part.

### 2.     David Skeel

Professor Skeel offers his opinion about the reasonableness of the bankruptcy settlements.  Again, because the Court has found that the settlements are reasonable as a matter of law, Professor Skeel's testimony is unnecessary.  RFC's Motion to exclude him is granted.

### 3.     Kenneth Feinberg

To the extent Mr. Feinberg intends to offer testimony as to the reasonableness of the bankruptcy settlements, his testimony is excluded.  He may, however, offer opinions regarding the propriety of the Allocated Breaching Loss approach that Dr. Snow proposes.

RFC complains about Feinberg's alleged lack of qualifications and the fact that he spent less than 30 hours on this case.  But those facts go to Mr. Feinberg's credibility, not the admissibility of his testimony.  Indeed, all of RFC's complaints about Feinberg's testimony are fodder for cross-examination, and not a reason to exclude him.  Aside from the reasonableness and loss-allocation restrictions mentioned above, the Court will not exclude Feinberg's testimony.

### 4.     Brian Lin

Lin's opinion focuses on what he views as RFC's servicing errors with respect to the loans at issue.   RFC does not contend that this opinion is improper, but asks the Court to exclude "a number of unsupported, irrelevant, and disparaging opinions Lin offers in purported 'corroboration' of his analysis."   (Pls.' Supp. Mem. (Docket No. 789) at 26.)

The testimony at issue concerns RFC's affiliated entity GMAC Mortgage, which received substantial media coverage regarding its illegal "robosigning" practices. According to RFC, Lin tries to impermissibly connect RFC to this robosigning scandal and to paint RFC's servicing business as suspect based on slim or no evidence.   RFC also argues that Lin relies on evidence that is hearsay and unduly prejudicial, such as news reports regarding GMAC.

Universal contends that Lin's opinion is that RFC's poor servicing performance caused a good portion, if not all, of the losses here.   According to Universal, Lin reviewed a number of Universal's at-issue loans and found that RFC and its affiliated entities committed servicing errors in all but one case.   And one of the alleged hearsay sources Lin relies on are the consent decrees between RFC and the FDIC and state attorneys general, which found that RFC and its affiliates were indeed very poor servicers and required RFC to make changes to its servicing processes.

Lin's testimony is admissible.   Of course, any hearsay sources on which Lin relies are inadmissible, unless there is an independent basis for the admission of the sources.

Lin's testimony is not excludable because he relies in part on evidence that is inadmissible. RFC's Motion as to Lin is denied.

**5.      Conclusion**

RFC's Motion to Exclude is granted in part as to William Berliner, and granted as to Professor Skeel.   It is in all other respects denied.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that**:

1.      Universal's Motion for Summary Judgment (Docket No. 698) is **GRANTED in part** and **DENIED in part**;

2.      Universal's Motion to Exclude Certain Opinions and Testimony of Plaintiffs' Experts (Docket No. 700) is **GRANTED in part** and **DENIED in part**;

3.      RFC's Motion for Partial Summary Judgment (Docket No. 702) is **GRANTED in part** and **DENIED in part**; and

4.      RFC's Motion to Exclude Expert Testimony (Docket No. 704) is **GRANTED in part** and **DENIED in part**.

Dated:   <u>October 12, 2018</u>

<u>*s/ Paul A. Magnuson*</u>
Paul A. Magnuson
United States District Court Judge